Checking the lawyers for case number three. Ms. Ingebrigtsen? Yes, present. And Ms. Betts? Yes, present. How does Ms. Betts appear on a participant list? Her last name is first, comma, first name, and initials B-O. Yes, okay, thank you. All right, Madam Clerk, please call the next case for argument. Case number 20-2359, Tessier's v. Secretary of Labor. All right, Ms. Ingebrigtsen, we'll hear from... Am I saying that right? How do you say your last name? That was dead on, Your Honor. Ingebrigtsen, we'll hear from you first. Thank you, Your Honor. Good afternoon, my name is Kelly Ingebrigtsen, and I represent petitioner Tessier's, Inc., in this matter. This appeal arises from an accident that occurred at a job site in Rapid City, South Dakota. The accident occurred when a Tessier's employee fell through a floor hole cover that the Tessier's employees had been trimming around the edges to make room for the installation of HVAC roof curbs. And HVAC is what Tessier's specializes in installing. Following the accident, OSHA had issued a serious level citation to Tessier's for a violation of 29 C.F.R. 1926-501-B4-i. And to save myself from repeating that, I'm just going to refer to it as a cited violation. After the ALJ had issued a decision in favor of the Secretary and the Occupational and Safety Health Review Commission declined review, Tessier's sought relief in this court. And there are three issues that we're presenting for the court's consideration on appeal. The first is a legal issue. And it's whether the ALJ abused his discretion by concluding that a covered floor hole met the legal definition of hole under regulation 1926-500-B. The second issue is whether substantial evidence supported the ALJ's conclusion that Tessier's employees had removed a one foot by three foot section of this floor hole cover. And the third issue is whether substantial evidence supported the ALJ's decision that Tessier's employees had constructive knowledge of the hazard and failed to exercise reasonable diligence to inspect the hazard. Counsel, the question for you, if we find that there was substantial evidence that your client's employees created a new hole by cutting off a significant portion of the cover, does that resolve your first issue as well? In other words, in your mind, are we dealing then whether or not a covered hole is a hole when you uncover part of the hole? Do you agree if that's the case, that that resolves the first issue? Yes, your honor. And that's why I wanted to present them in this order. Because I think for Tessier's to succeed, we first have to show that the judge's legal conclusion as to the first issue was erroneous. And then substantial evidence didn't support the judge's conclusion on the second issue. So I would agree with you if the court decided that Tessier's had removed the one foot by three foot section, there would be no need to address the administrative law judge's first legal conclusion. So the first issue that we're challenging, of course, is a legal issue. And this is really vested in the plain language of the regulation at issue. This regulation provides that each employee on a walking or working service has to be protected from falling through holes. And it has to be protected by falling through holes but personal fall arrest systems, covers, or guardrail systems erected around the holes. Now this reference to the word holes is tantamount to what we're arguing here because a hole is defined as a gap or a void two inches or more in its least dimension. Tessier's contends that the administrative law judge erred as a matter of law when he concluded that a covered hole met the definition of a hole. And we think that this reasoning misses the point. Because while a hole might exist underneath a covered hole, there was no hole within the meaning of the regulation when Tessier's employees began working on this air handling unit. And I'll refer to it as air handling unit number five because there were approximately six of these holes on the roof. And on that day in question, air handling unit number four was the one that had the floor hole cover that ultimately collapsed. The Tessier's argues here, your honors, that no hole was exposed during its work because when they approached air handling unit number four, it was completely covered. And at no point during their work on the hole, which gets back to your other question, your honor, and ties into my second issue, but at no point during Tessier's work, did they ever expose a hole greater than two inches or more in the least dimension. Now, there would be no point in applying this regulation to cite an employer if the hole was already covered because this logic would be akin to saying, if the hole's covered, an employer would also be required to use fall protection or an employer would also be required to use guardrails. And this simply makes no sense. And it made no sense here. The secretary argues that Tessier's should be held accountable for violating this cited regulation because Tessier's modified the floor hole cover and it eventually collapsed. And again, I think this argument misses the point because the cited standard can apply in the absence of a hole. And when Tessier's approached the hole or approached the covered hole and worked on it, at no point did they expose any hole that was greater than two inches or more in its least dimension. There was trimming work that was performed around the edges and unbeknownst to Tessier's who was working on the hole, this cover was what's called friction fit. And there's a distinct difference in the industry, Your Honor, between friction fit covers, which were not known to Tessier's versus structurally affixed covers. And the distinction is very important here and it will become even more important when I discuss the third issue. So I just want to preview it briefly. A friction fit cover is a cover that fits snugly inside of a floor hole and it has an interior frame constructed by two by fours. And then on top is the plywood and there has to be overhang on this plywood in order for the cover to stay up. Now, Tessier's had never encountered a cover like this before that covered a hole of this size before. And all of their years and decades of experience on the job,  that were structurally affixed to the building. Structurally affixed covers are fundamentally different from friction covers. Structurally affixed covers are physically, the frame is physically drilled into that concrete below and there need be no overhang of the plywood on top. So the plywood sits on top of a frame that is structurally affixed to the building. So when you make modifications to plywood that is surrounding the cover on a structurally affixed cover, the cover doesn't move. It doesn't budge. It doesn't do anything that would compromise the integrity of the cover or the safety of the employees. And this is important here because this is why Tessier's employees believed they were 100% safe to modify this floor hole cover. And indeed the record shows, we would contend that at no point during Tessier's work on this cover, did they ever expose a hole that was greater than two inches or more in its least dimension. This of course leads me to my second issue. And this was the Administrative Law Judge's second conclusion that Tessier's had exposed a one foot by three foot hole. So the primary reasons that the Administrative Law Judge concluded that Tessier's had exposed this hole were based on three pieces of evidence. The first is testimonial and the other two are physical. The first piece of testimonial evidence was from the injured employee, Cameron Pepke. And the ALJ determined that because Mr. Pepke had testified during his deposition that he had removed that section, that indicated that Tessier's had indeed removed the section. The second piece of evidence was that this one foot by three foot section remained on the roof of the building where the remainder of the cover fell through to the floor. And the third piece of evidence that the ALJ relied on was that the two by fours that ran the length of the cover underneath didn't have screw holes that showed a volcano effect. And this will become more apparent as to the relevance later when I discuss the evidence that contradicts the ALJ's conclusion. So Tessier's does not believe substantial evidence supported this conclusion for five main reasons. The first is Mr. Pepke's deposition testimony. Mr. Pepke testified inconclusively at trial that he and his coworker, Mr. Fenner, did not remove the one foot by three foot section on the short end of the four hole cover. And I understand that this contradicts his testimony at his deposition. But during his deposition, Mr. Pepke had never been deposed. He had never had to relive his accident. He had never viewed photographs of the accident scene before. And his injury caused memory loss. The second piece of evidence that we think undermines the ALJ's conclusion is that Tessier's employees had no practical reason to remove this one foot by three foot section. And this will require a little bit of visualization by your honors here. The work that Tessier's was performing was picture a rectangular four hole cover. And they were trimming the edges of this cover. And the one foot by three foot section, let's say was on the right hand side of this cover. Well, when Tessier's employees first approached this cover, they trimmed a one inch section from this one foot by three foot cover. They then proceeded to move to the long edge of the rectangle and move from left to right to trim that section of the cover. And it's when they were trimming that long edge that they testified the cover collapsed. And the secretary had argued in its brief that there's no way that that one foot by three foot piece section could have possibly stayed up on the roof. Well, respectfully, I would disagree. If they had only trimmed the short edge overhang, there still would have been two opposite sides overhanging on this cover, which could have easily explained why the cover remained on the roof. The simple fact is, we don't know. Nobody testified as to how that small piece remained on the roof. There were also been no reason for Tessier's employees to remove that one foot by three foot section because they had already saw that short edge. And Mr. Fenner testified when they were cutting that long edge, they hadn't even reached the one foot by three foot section. So they hadn't even reached that edge of the overhang. And they could have easily used a saw to cut that edge of overhang when they got to that point. The third piece of evidence that's germane here is that Mr. Fenner and Mr. Pepke, they showed photographs on this site. And the photographs showed that there were volcano screw holes left by this one foot by three foot section. So when you look at the frame of the original cover and you look at the photographs that we presented in our brief, you'll see that there are little volcano holes which indicate a forcible ripping up of screws. And again, this supports my argument that that one foot by three foot section stayed up. And when the cover fell down, it created the volcanoes in the screw holes on the main frame of the cover. It was that force of the fall. Now, the fifth piece of evidence that's very important here, Your Honor, is that Tessier's employees executed witness statements immediately following the incident. And all of these witness statements indicated the only thing that they removed was the one inch section of the cover that they were trimming. There was no evidence that they removed that one foot by three foot section. And this brings me to my last point, Your Honor, and that is that Tessier's employees also exercised reasonable diligence. And the reason they exercised reasonable diligence is because, as I explained earlier, they had no knowledge that a friction-fit floor hole cover would be used on a hole of this type. They had only ever seen structurally affixed floor hole covers. And on the day of the accident, that was the first day they got up on the roof. Every other day when they had been working down below, they had been working in the presence of structurally affixed floor hole covers. So it was reasonable for them to assume when they went up on the roof that day that the floor hole covers on the roof would be the same as the floor hole covers down below. They also conducted a visual inspection. They observed that the floor hole covers looked to be structurally affixed to the building. And indeed, when they made their first cut and took out a small inch, what they saw down below was framing, two-by-four framing, which, of course, was consistent with their understanding the frame was structurally affixed. All of these evidence, Your Honor, I believe shows that Tezzier's employees exercised reasonable diligence. And I want to emphasize... Just to make sure I understand the way the cover was designed here. Had they simply lifted the cover, would they have determined that it was a friction cover, or at least that it was not secured to the structure in some way? I'm still playing with, in my own mind, exactly how these covers work. My understanding is they probably could have pulled it up and discovered that. Possible, Your Honor, but because it's friction fit, it's supposed to be a very tight fit, and it's supposed to be hard to pull up. So if it was friction fit, it's not something you can get your fingers under, because it rests flush with the concrete. So to pull it up, you'd probably have to pry it. And that would take quite a bit of strength. And I see I have one minute remaining, so I want to reserve the remainder of my one minute for rebuttal, if Your Honors have no other questions. Very well, you may. Thank you for your argument. Ms. Betz, we'll hear from you. Good afternoon, Your Honors. I'm Louise Betz for the Secretary of Labor. May it please the Court. In its most basic form, this is a substantial evidence case. And the question before the Court is whether a reasonable mind could conclude on this record, as the ALJ did, that Teziers removed a one foot by three foot section from the cover before the rest of the cover collapsed. If so, the Court doesn't need to reach either of the two other issues, because at that point, the employees created a one foot by three foot hole that clearly met the definition of hole. And at that point, they clearly would have known about the hole they created. So Teziers can only prevail in this case by convincing the Court that no reasonable mind could conclude that Mr. Fenner and Mr. Pepke removed that section of the cover. But more than substantial evidence supports the ALJ's conclusion that they did remove that section. First of all, Mr. Pepke admitted in his deposition that they removed that section of the cover. And Mr. Pepke's deposition testimony was consistent with the physical evidence, the presence of the disputed section on the roof after the fall, not in the hole, but outside the hole, outside the roof curb, on the other side from where it had been sitting inside the hole. So someone clearly, at some point, removed this section from the hole and placed it outside the hole. The only evidence in the record of how this could have happened is Mr. Pepke's testimony that they removed that section before the rest of the cover collapsed. Mr. Fenner conceded that he could have done this. He never denied it, despite having the opportunity to deny it in the hearing. And not a single witness testified that they might have moved that section after the cover collapsed. Not a single witness testified that someone else might have done this. There is not a shred of evidence anywhere in the record that anyone moved that disputed section outside of the hole after Mr. Pepke fell. And not only is the record devoid of any affirmative evidence that this happened, but the two employees responsible for preserving the scene, Jared Bratt and Paul Adams, both testified affirmatively that no one could have done that. The only way to move that section after the accident would have been for someone to access the roof. And both employees responsible for preserving the scene testified that no one did that. So not only does substantial evidence support the ALJ's conclusion that Mr. Fenner and Mr. Pepke removed that section before the rest of the cover collapsed beneath Mr. Pepke's weight, Tassuz is asking the court to reverse the ALJ's findings based on a theoretical possibility that someone could have moved the one foot by three foot section after Mr. Pepke's fall, even though there's no evidence whatsoever that anyone did that. The volcano effect evidence also doesn't undermine the ALJ's factual finding that they removed the section before the fall for a couple of reasons. First of all, I think most importantly, the volcano effect was only present on the screw holes on the three foot side of this disputed section where it connected to the rest of the cover. And to the extent that the volcano effect tends to show that those screws were ripped out rather than pulled out, rather than removed by a screwdriver, that could be explained by the fact that Mr. Fenner stated to OSHA during the inspection that they used a screwdriver to pry up some portions of this cover. And that's on the petitioner's appendix, page 1110. In addition to that, the ALJ noted and the photographic evidence demonstrates, and this is at the petitioner's appendix 1212, 1215, 1217, and 1218, that the one foot sides of the disputed section, the one foot by three foot section, had clean screw holes. No volcano effect. So there's no version of Tessier's theory that could explain why those edges would have had clean screw holes. Because if the rest of the cover ripped out the other screws with the force of falling through the hole, it would have ripped out the screws on the one foot by one foot ends too. And in addition, they've got the same problem that runs through their entire sort of speculative theory about what theoretically could have happened, is that, you know, the only, if their explanation is that someone sort of removed those screws after the fall using a screwdriver, first of all, it doesn't explain why they weren't ripped when the rest of the cover fell through. But second of all, again, there's no evidence that anyone moved that section after the fall. And there's affirmative evidence that it would have been impossible for someone to do that because no one was allowed to access the roof after Mr. Pepke fell through the hole. So because substantial evidence supports the ALJ's conclusion that they removed this section, they created a one foot by three foot hole and they were aware of the hole they created. The court doesn't need to get to the company's convoluted theory that the hole Mr. Pepke's fell through wasn't a hole. If the court does reach that interpretive question, even if the company hadn't removed the one foot by three foot section, the standard still applied. So the standard cited here, section 1926.501B4I requires employees working near holes to be, quote, protected from falling through holes, close quote. That was the violation here. The violation was that  were not protected from falling through the hole when they were modifying the cover. There's no dispute that the Tessier's employees were not protected from falling through the hole when they were modifying the covers. Tessier's doesn't argue that the covers protected them from falling through the holes while the employees were modifying them. And the question for the court isn't whether the employees could see the hole at the time. The question is whether they were protected from falling through the hole, because that's what the standard requires. Counsel, isn't one of the specified ways to protect from falling through a hole that put a cover on it? And in this case, there was a cover on it. What additional steps were they supposed to take in your view here? Your Honor, if what they were doing was simply working near the cover, that would be a question of whether the cover was adequate. But the question in this case was, well, I don't want to not answer your question. So just to sort of clarify kind of the circumstances that the violation occurred here while they were modifying the cover.  there was no fall protection in the hole. And so that's a question why there was a violation of the cited standard 501B4I. It wasn't just that the standard had a cover on it. It didn't really, for all intents and purposes, have a cover on it once they started modifying it because there was nothing in the hole to provide fall protection. And what section 1926.501B4I requires is that the employees be protected from falling through the hole. Tessiers doesn't argue that they were protected from falling through the hole. They clearly weren't. What Tessiers seems to be arguing is that the standard didn't apply because the hole wasn't visible. But if simply concealing the hole beneath something that provided no fall protection value rendered the standard inapplicable on the theory that the hole stopped being a hole at that point, as Tessiers argues, then the standard's requirement that employees actually be protected from falling through holes wouldn't have any meaning. Interpreting the standard the way Tessiers urges would lead to the absurd result that the very standard meant to protect employees from falling through holes wouldn't apply to a hole that was concealed beneath something that provides no fall protection. And that would defeat the standard's explicit purpose. So let me ask you this. I may be belaboring this point, but let's assume someone else had secured the cover in the hole and had done so in a negligent manner. And Tessiers' employees stepped on the cover without modifying it and fell through. Would they be liable for that? Or is it all triggered here on the fact that they were modifying it? So I think that question sort of gets at which standard applies. I think if, in your hypothetical, they stepped on a sort of improperly installed cover that failed, but they weren't modifying the cover, at that point, the violation was that the cover violated section 1926.502.I2 because it couldn't support the required weight. I mean, the question of which employer is responsible for that violation would turn on the sorts of sort of constructive knowledge kind of elements we have here. So without kind of knowing what those facts are, that seemed to also be a component of the question, you know, which employer is responsible for that. In this case, though, the work being performed was modifying the cover. So the question is, what was required while that work was being performed? And that question is covered by the cited standard section 1926.501.B4.I because that's the standard that requires that some form of fall protection be present in the hole to protect them. And there's no dispute that once they started modifying the covers, nothing protected them from falling through the holes. The covers at that point just concealed the hole, but they didn't actually prevent employees from falling through it. Given the plain language of the cited provision and the obvious fact that the hole still presented hazard and still existed beneath the cover, given the context of the cited provision within the larger standard and the standard's purpose of protecting employees from falling through holes, the standard unambiguously required TESIers to protect its employees through alternative means while they were modifying the hole cover. And even if the standard were ambiguous, the secretary's interpretation is reasonable because it's consistent with the standard's plain language and with its clear purpose. So turning finally to the constructive knowledge question, and again, the court only needs to reach this question if it concludes that substantial evidence did not support the ALJs finding that they removed the one foot by three foot section because in that case, they clearly would have known about the hole they created. So even if they didn't remove that section, the company had constructive knowledge that the hole lacked adequate fall protection once they started removing the trim because they could have discovered through the exercise of reasonable diligence that those modifications compromised the integrity of the cover. Essentially, they removed fall protection from the hole without using alternative fall protection. Reasonable diligence requires much more than the company did here. The case law is clear that reasonable diligence is an active inquiry involving proactive steps. TESIers needed to do more than just look at the top of the cover. That's the purpose of the pretest plan, which the company itself required, in which a supervisor supposed to think about the tasks that they're about to do, anticipate the hazards associated with those tasks, and make sure that employees were protected from those hazards. But these employees were in a rush. They didn't complete the pretest plan. They assumed that the covers were fastened to the building, but they didn't verify it. And there's no basis for assuming that the roof covers were the same as the second floor covers that were bolted in. They didn't look at all similar. The second floor covers had visible bolts, and they were constructed differently. The covers on the roof had no visible bolts because, indeed, they were not bolted to the structure. TESIers could have investigated, done a physical inspection of the cover, either to attempt to lift it, which nobody did. There isn't any evidence in the record on whether it would have been possible for them to lift the cover. They didn't try. And they could have viewed it from below using a scissor lift that was down there, but they didn't try. They also, perhaps most importantly, could have asked the contractor who installed the cover whether it was safe to remove the trim. But they didn't do that. They easily could have done those things, and their failure to do so constituted a lack of reasonable diligence. The company calls this hindsight, but, in fact, the case law is clear that reasonable diligence requires foresight. It requires the employer to anticipate what could go wrong, what hazards could exist, and to protect employees from those hazards. TESIers just didn't think things through because they were in a rush, and reasonable diligence requires thinking things through. TESIers hasn't cited a single case supporting the theory that they were entitled to rely on an assumption that the covers could withstand their modifications without verifying that assumption. And they haven't cited a single case establishing that Leighton Gustafson should have known to tell them how the covers were constructed when they had no reason to believe that TESIers would modify them. So because TESIers could have discovered the violation through the exercise of reasonable diligence, the company had constructive knowledge of the need for alternative fall protection because the whole lacked a means to protect employees to fall through it once the employees started modifying the cover. I was just going to say, if there are no questions, the secretary urges the court to deny the petition for review and affirm the final order of the commission. Thank you. Very well. Thank you for your argument. Ms. Ingerbretson, we'll hear from you in rebuttal. Thank you, your honors. Very briefly, I just want to point out that there is a catch-22 in this case. The secretaries argued throughout this case, both appeal and at the lower level, that TESIers could not show that the cover as installed was deficient in any way as TESIers believed that it was. And the ALJ concluded this as well, that TESIers couldn't present any evidence that the cover was deficient. Well, now on appeal, I hear the secretary arguing that TESIers is merely relying on the fact that the whole was concealed. And couldn't rely on the fact that the whole cover would have been adequate. And of course, this presents that catch-22. TESIers can't prove that the whole cover was inadequate because immediately after the accident occurred, the whole cover was destroyed and every other floor cover on the project was destroyed and replaced with a structurally fixed floor hole cover. I see that my time has expired, but if there are any more questions, I'm willing to field that one. I'll go back to the basic question. I think maybe Judge Kovas has asked it. If this cover had not been modified, the accident would not have occurred because it would have supported the weight of the injured person. Well, I would submit, Your Honor, that there's no proof of that. And we don't know that the floor hole cover would have been adequate because it was never tested. None of the floor hole covers that were friction fit were tested. All we know is that this floor hole- In other words, you're saying that your modification of the cover had nothing to do with the accident. No, Your Honor. What I'm saying is that the secretary hasn't proven that our modifications created a hole that the regulation would apply to, and that TESIERS can be held responsible for. I don't think you're grasping at straws, but that's my version of it. I don't mean to be flippant when I say you're grasping at straws. Thank you, Your Honor. I appreciate the question. And if there are no other questions, let us rest on the brief. Very well. Thank you to both counsel for your arguments. The case is submitted and the court will file a decision in due course. Thank you. Counselor excused. You may disconnect or remain on the conference as you wish.